Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good afternoon, Your Honors. My name is Ms. Bales. Pardon me? You may proceed, Ms. Bales. Thank you, Your Honor. I'm arguing today on behalf of David Runyon. This Court should set aside Mr. Runyon's death sentences for two different reasons. First, the jury that sentenced him to death did not hear compelling mitigating evidence of his brain damage and severe mental illness. This is the type of evidence the Supreme Court has found is mitigating and persuasive. Thus, a new sentencing hearing is warranted under Strickland. The second basis for setting aside his death sentences is that one of the death sentences now rests now on what we know is a void conviction under Davis. And that is the second basis for setting aside the death sentence. I will talk about the Strickland claim first, and then I will move into discussing the Davis claim. The trial counsel failed to present compelling mitigating evidence that Mr. Runyon is brain damaged and suffers from severe mental illness. This evidence is not cumulative. And it would have supported two statutory mitigating circumstances that Mr. Runyon suffers from a severe mental illness or psychiatric disturbance and that his capacity to conform his behavior to the law is impaired. And those are statutory circumstances under the Federal Death Penalty Act. The unpresented evidence would have reduced his moral culpability and it would have rebutted the government's case in aggravation. Trial counsel had in his possession three preliminary reports from experts that suggested Mr. Runyon suffers brain damage, asking for additional information, and encouraging trial counsel to investigate this further. Dr. Nelson told trial counsel neuropsychological deficits was a defining characteristic for Mr. Runyon, and that a neuropsych evaluation was necessary. Dr. Murski also said that an assessment by a neurologist was warranted. He noted that Runyon's symptoms of quickness to anger, impulsiveness, dizziness, trouble maintaining attention, all of those symptoms were not warranted. None of those are consistent with brain damage. Dr. Murski asked that he be allowed to do additional testing. And then Dr. Marikangas offered a preliminary report, and he noted that the right side of Mr. Runyon's forehead does not move when he makes a facial expression, and he noted that his right lip sagged. He also noted that he believed Mr. Runyon could be suffering from delusions. He found that he probably had impaired executive functioning related to frontal lobe damage. Dr. Marikangas asked... And that he basically should be spared the death penalty because there was no chance of him being dangerous in prison. And yet, what you referred to was mental health evidence that emphasized two traits, one, anger and impulsiveness. And if that evidence had been brought before jury, would it not have undermined the whole case that counsel was trying to make about his prospects for decent behavior going forward? Your Honor, it would not have undermined that aspect of the case. We know that people who have brain damage can do very well in a controlled setting where all of their choices that arise during a day-to-day living are removed from them. They do very well in a structured setting. But I'd also like to back up and talk about what the court referred to as counsel's strategic decision. Strategic choices that are made based on incomplete investigation are not entitled to deference. Strategic decisions that are based on incomplete information are reasonable precisely to the extent that reasonable professional judgment directs that this is an acceptable point to terminate the investigation. And in this case, trial counsel, all of the investigation with the mental health experts indicated that these statutory mitigating circumstances were going to be fruitful. So it was not a reasonable professional decision for counsel to terminate that line of investigation. The question of a strategic decision, this record does not support that counsel made a strategic decision. If you look at the motions that were filed pre-trial, counsel was asking for more time so that he could do the investigation into mental health evidence. Once the jury came back with a guilty verdict, trial counsel again asked for more time. So trial counsel had an intention, the record reflects that, to investigate and present mental health evidence. Within the record, your honor, there are two different declarations that trial counsel prepared. And in those declarations, he avers under oath that he does not remember why the expert testimony was presented. He also... You mean it was not presented, correct? Yes, your honor. Okay, go ahead. He also states that the type of evidence that we uncovered in post-conviction was the type of evidence that he was trying to find. That he was hoping that he could uncover and present to the jury. And he was asked about various reasons why he might not have presented this evidence. And he explained that the factors that the state argued in their answer, those factors would not have deterred him from presenting this evidence. And the evidence that counsel should have presented is compelling because it's not only expert testimony. There are records that exist from long before these charges happened. That suggest brain damage and mental illness. There are military records from the mid-1970s where Runyon sought treatment after having a car wreck. And he describes the vertigo, a dizziness, headaches. And he talks a lot about this significant, serious car wreck and how this has affected him. The military records also note that... The military records, for example, there are military records concerning an accident, for example. But the problem was they did not contain evidence of serious neurological damage. Most of the evidence related to the car accidents contained... Went to physical damage to Runyon's knees and shoulders. And so I don't understand, you know, what difference something like that would make. And the evidence of the blast injuries, for example, it's not clear that they ever happened. Because only Runyon's say-so supported that they'd ever happened. I mean, trial counsel tried to look for the records of the blast injuries, but he couldn't find it. And so he decided not to present evidence of blast injuries. Because the government could have rebutted it by saying, well, no records of the injuries even existed. So the injuries in the car accidents, on the one hand, it's unclear that they happened. And on the other hand, the records concerning the accident seem to go to joint damage, but not neurological damage. So I went through these different pieces of evidence, and I just was unclear about why they didn't represent a reasonable strategic decision. And whether there was a reasonable probability that a different result would have obtained. And I just point out those two, the blast injuries and the car accidents. What do you have to say about that? So the Army records do document vertigo and dizziness, and that is consistent with neurological injuries. But also, Dr. Mary Kangas noted physical abnormalities on the right side of Mr. Runyon's face and head. Physical abnormalities. And the MRI that was conducted noted white hyperintensities that were on the front right side of Mr. Runyon's brain. In addition, Dr. Patterson noted the physical abnormalities on Mr. Runyon's face. And attributed it likely to an injury he sustained when he was three years old and his father threw him against the wall. So a complete investigation would have established that Mr. Runyon has brain damage and that that affects his behavior. Your Honors, I want to address the Davis claim also, so I'm going to wrap up the Strickland claim now. Your Honor, the evidence that is presented accompanying the petition, we've offered the expert testimony. We have Army reports. There are jail records that document him having voicing delusional ideology. We have lay witness declarations. All of that was presented to the district court. All of that is evidence that occurred outside of the record. And we have trial counsel saying that he does not remember a decision being made to not present this. So we believe, based on all of that evidence, we're entitled to relief on the Strickland claim. But should this court have questions about any of that evidence, the appropriate remedy would be to remand for an evidentiary hearing. We offered all of this evidence. The government didn't come back with any evidence. And the trial court actually made several credibility findings in denying relief. And, of course, we know if you're going to deny hearing, the court should have accredited all of our evidence. And so if the court is not convinced of the Strickland claim, which we believe we have established, the appropriate remedy would be to remand and let an evidentiary hearing happen. Turning to the Davis claim, one of the death sentences in Mr. Runyon's case is a death sentence on the 924J. And that's a 924C count that had, as the predicate, either carjacking and conspiracy. And under this court's case law, the van en banc opinion, that had to go to the jury in the conjunctive. And this court has held that when you have a crime that goes to the jury in the conjunctive like that, unless you have a special verdict, the court has to assume that it was the least culpable predicate offense. In this case, we do not have a special verdict. And so the court has to assume that it was the least culpable event or culpable predicate. Ms. Bales, this is Judge Neumeyer. Just to cut through a little bit of the setup that you're going through. We have been through this type of analysis quite a bit. Let me just ask you, would you agree that we should be determining whether there was a crime of violence, that is the conspiracy count, on a modified categorical approach? Yes, Your Honor, I would. And I thought you would say that. I think that's right. And once we're in that situation, then what elements are we looking at with respect to the conspiracy count? What were the elements of conviction? So, the conspiracy is an agreement to act... No, not a conspiracy. No, the conspiracy in this case. What was he charged with and what was he convicted of? He was charged with conspiracy to commit murder for hire resulting in death. And he was convicted of that. Isn't it an element of that conspiracy that there be the intent to kill? Your Honor, there is not. And I have two different reasons for that. First, under Torres-Miguel, this court has consistently held that resulting does not equal... I understand that. I want you to get to the focus of whether a conspiracy with intent to kill is an element. Your Honor, we submitted a 28-J letter discussing this, and it cites to this court's Middleton case where the court admonished that you cannot conflate the intent with the resulting element. That is not my question. I understand that issue. We have the all-red decision, which addresses that much more directly. But that's not my question. See if you can follow me, because I really... it's important. My question is... well, I'll put it a little differently. I assumed in reading this that the elements of the conviction in this case was, number one, a conspiracy. Number two, with the intent to kill. Three, resulting in death. And my question is, are those the elements? Yes, Your Honor, it is. And the third element that you mentioned is the resulting in death. But that's not my interesting one. My interesting one is the second element. When you have a conspiracy with intent to kill, and you take any step in furtherance of that conspiracy, or even hold a conspiracy, that is your purpose, to kill. And then death results. You have a detached cause, a mens rea, of course. But in all red, we explained how that is almost impossible to not have the intent to kill implicating the resulting death. And if you think there is a case where they've prosecuted such a claim, where there was no... where the resulting death was not pursuant to the intent of the conspiracy, that would be interesting. I don't think you can even concoct one. But counsel... We're required to show there's a reasonable probability that we've proposed a hypothetical where a car accident occurs and the death is accidental. But that doesn't include the conspiracy's intent to kill. In other words, the conspiracy has to hold the intent to kill. And when you have that mens rea as part of the conspiracy, and then you have resulting death, all red teaches us that that is basically... any hypothetical would be almost absurd, where the death was not connected with the intent to kill. You're under... Counsel, when your favorite responded that Judge Nehemiah set out those three elements, conspiracy, intent to kill, and resulting in death, it doesn't appear for the conspiracy, it doesn't require an act of... acting in furtherance, does it? It does not, Your Honor. And, you know, this court has been very disciplined to apply a categorical approach. And in sentence, I believe it was, the court said the categorical approach begins and ends with the elements. And when the court... when you look at the result... the resulting in death, that does not have a mens rea in it. And we've offered several published cases where death has resulted, and the court, where the language of the statute is resulting in death. But get down to a real-world situation. You have a conspiracy, in which the conspirators have an actual intent to kill. They must have that intent. That's an element. They get to a conspiracy, have an actual intent to kill, and death results. You would have to have a suggestion where they intended to kill, but some different death resulted. That's correct, Your Honor. Have you ever seen such a case? Your Honor, in the on-bank United States v. Aparicio Soria, this court held that you don't have to... the defendant does not have to point to a specific case with identical facts where a prosecution was brought. This court used the phrase mundane legal research, meaning that we can do legal research, and if other cases define the element we're talking about, then we can cite to those other cases to demonstrate that there is a reasonable possibility. Yeah, but you like to isolate the resulting in death, which, of course, can be by accident, or can be by recklessness, or can be intentional. But the more difficult task is to combine the resulting death with the intent to kill as part of the conspiracy. When you have those two elements present, you have a different situation than the cases that just address resulting death. Your Honor, the resulting in death has, under this court's case law, has always been understood to not have a mens re. And under the categorical approach, the court needs to look at whether the conspiracy and whether the death happens at the same time as the intent. That's why those mens re are set out in different elements. The court is inflating... Yeah, but counsel, for example, if you had a conspiracy to hire for murder, to murder A, and then someone tries to shoot A and hits B and kills him, I think you could be prosecuted for that. Your Honor, the... Because as a result of that conspiracy to hire someone to kill B, A, B died because they missed the gun when it was hit and it killed somebody else, so it would be completed, would it not? That would establish... That would establish the conviction, Your Honor, but it would not meet the elements... It would not establish the force... It would not meet... That's my point. That's the point I'm making. It does not require force at all  That's the point. Yes, Your Honor. I would agree with that. If the court finds that the conspiracy is a crime of violence or is not a crime of violence, I'd like to turn to what the appropriate remedy would be. Your Honor, may I answer that question? You may. Thank you. The indictment charged Mr. Runyon with murder, with a firearm, in relation to a crime of violence. And, of course, the murder with a firearm rests on the 924C count that the court would have struck as void. So the appropriate remedy here would be a new sentencing hearing because the jury was instructed all of the elements of murder... All of the jury instructions centered on what the trial court called the murder charge. All that is left is the conspiracy charge. So that obviously takes away a lot of weight from what is a death case. Also, the jury deliberated twice as long on this case in the sentencing phase as it did in the guilt phase. And they actually asked the court what would happen if they could not agree on a verdict. Finally, we know that under the Eighth Amendment, this death sentence is subject to a heightened level of reliability. And where half of the basis for the death sentence is set aside, the appropriate remedy is to remand for a new sentencing hearing. Thank you. Thank you, counsel. Mr. Samuels? Thank you, Chief Judge Gregory. Good afternoon, Your Honors. My name is Brian Samuels for the United States. And may it please the court, the defense counsel has raised a number of challenges to Mr. Runyon's conviction and death sentence through their habeas petition and appeal. Ms. Bales has discussed two of those issues out of the four today. I will start there, but I'm also willing to discuss any of the other issues, of course. And I'll start where Ms. Bales did with the mental health issue. And the defense argues that trial counsel failed to pursue or failed to present a mitigation strategy focused on mental health. As this court has said in the Meyer v. Bank case, sometimes the nature of the evidence, rather than counsel's judgment, prejudices the defendant. And that was such a case here, Your Honors. And first, looking at this case on the Strickland claim, looking at what counsel did here, it is hard to envision that counsel could have taken more steps than they did to try and investigate this mental health claim. And the record, as Judge Smith reviewed in her order denying the habeas claim, went through some detail in laying out all of the steps that trial counsel took to obtain experts, to modify and obtain results and provide testing. And all of the efforts that defense counsel took prior to the penalty phase. And what the court has to look at is what counsel had done and what it was left with at the time this penalty phase had started. And initially, counsel looked at Dr. Nelson and Dr. Cunningham. Dr. Nelson's report, by the same declarations that defense counsel are referencing, was not favorable to David Runyon. And the declaration from Attorney Woodward indicates that as well. His report was not favorable. So trial counsel looked for new experts and found new experts going into the trial, a neurologist and a neuropsychologist. But as they were preparing to examine David Runyon, defense counsel did not discuss there were reports of the government experts. And those government experts certainly threw into question whether there were any legitimate issues for mental health on mitigation. Finding, in fact, no issues. And that David Runyon had a personality disorder. So what defense counsel had was an unfavorable report from Dr. Nelson. He had two unfavorable reports from the government's experts. And it had preliminary reports from Dr. Murski and Dr. Merikangas that were leads, but they were dry leads. They were thin reports. Dr. Murski's report reflected that David Runyon... Yes, Your Honor. ...had to draw leads when the expert tells you you need a follow-up with a neurologist for evaluation. How is that a dry lead when you don't even do it? Well, Your Honor, trial counsel did follow that up. He did arrange for a neurologist, and that was Dr. Merikangas. And when Dr. Merikangas recommended that these tests be done, that the MRI and the PET tests be done, trial counsel followed up with that, arranged for that to be done, moved for the court to provide the results of that test directly to trial counsel and to be able to supplement the reports. The indication from the materials in the joint appendix is that the results of those scans did not reveal any issues. They were clear scans. And both preliminary reports of Dr. Merikangas and Dr. Murski said... You have that? Is that in the record? Yes, Your Honor, it is. There is an email... There is an email between Dr. Merikangas and trial counsel Hudgens in September, and this is in the record at JA2133, where Dr. Murski is writing a letter to trial counsel Hudgens and indicates that he is aware that the report of the scans were clear. Actually, that's a little misleading because the radiologist saw it as clear but he was not an expert. And the experts that reviewed it did see extenuated white matter. They did later, of course, but... Your Honor, that's... So I don't think you can rely on the radiologist reading it when Dr. Merikangas concluded before trial that the defendant clearly had an impaired executive functioning, and suggested a suggestive of frontal lobe brain impairment. In other words, he was sure there was a problem, and he wasn't sure it was down. And the same thing is true with respect to Dr. Murski. He said it's clear from the data there is strong evidence he's suffering from a neurological disorder. These are pre-trial. And those two doctors were not given the MRIs before trial to look at. Your question is, why weren't they put on? Well, Your Honor, we know that the MRI and the PET scan were ordered before trial. I understand, but they were not reviewed by the experts. And we know that... My question is, why weren't Dr. Merikangas and Dr. Murski, why weren't they put on? Or why wasn't that pursued? Well, Your Honor, we do know that there were no follow-up reports from Dr. Merikangas or Dr. Murski at that time prior to trial, or thereafter until 2015 when those reports were prepared. We do know that Defense Counsel had sought permission to get those results of those scans and provide them directly to the experts. It's unclear when exactly that was done until we have that letter in September of 2009 where Dr. Murski indicates, your report to me indicated that the MRI and PET imaging studies of Mr. Runyon were read as normal. That's the indication that we have as to what information trial counsel had and at some point was conveyed to... Wasn't that after the trial? The letters dated after the trial, Your Honor, it's unclear when that information was provided. What we know from the record is that there are no supplemental expert reports from either Dr. Murski or Dr. Merikangas. We know that trial counsel had sought permission to release the results of those scans to Dr. Murski and Dr. Merikangas. But until that September letter, we don't know the timeline as to when those were produced by trial counsel. Both doctors clearly did not have the information and their reports could not be final until they conducted that analysis. But both doctors indicated the presence of some serious damage. I mean, Dr. Merikangas said, and I'm quoting, he clearly has impaired executive functioning suggestive of frontal lobe brain impairment. Now, this is stated to counsel before. But both doctors said that further investigation needed to be conducted. Now, the question is, why wasn't that done before trial? And why didn't the attorneys put these doctors on the stand? Well, Judge Meerman, that's a fair question. And I would say that the report of Dr. Merikangas said that David Runyon was also suffering from the withdrawal of experimental drugs. There's no indication as to how that opinion was derived. What supported that opinion? The report of Dr. Murski said that David Runyon had strong showings in the general intelligence area. He had issues in terms of the attention area. And I am going to answer your question, Your Honor. So what counsel had were those reports and then he had the reports of the government. And then we also have to consider that counsel had the findings of the jury in determining that David Runyon had engaged in planning in carrying out this crime. And so trial counsel had to determine what was the best strategy to pursue given the findings of the jury and all of the other evidence that came in. Where's the evidence of that? I looked for it and I couldn't find it. Attorney Hudgens said just the opposite. He said he was looking for that information. That was the type of information he wanted. And he didn't know why they didn't put it on. This is not a case where he said I considered that information and rejected it. I couldn't find it. Maybe you can point that out. Your Honor, I looked at his declaration as well. It didn't appear that he had a clear memory of what the scans were. He talked about this being the type of information that he wanted to find. But I know he made the statement that he made a strategic decision and he didn't. He clearly didn't. He said he didn't. Well, Your Honor, what I meant by that was trial counsel in looking at the evidence that was available put on in mitigation, they chose a course that would not have aligned with this mental health information that indicated even taking it as it is that David Runyon had impulsivity issues, that he had anger issues. They chose a course and this gets to the prejudice aspect of the Strickland prong to show that David Runyon was not the worst of the worst. They called 21 witnesses in their mitigation case including one expert, Dr. Cunningham, to testify as to factors, stable factors about David Runyon, his age, his education, his work history, his relationship with families that would show that he was not going to be a danger going forward. They also called his mother, his father, his brother, his ex-wife. And the clear pattern that emerged from all these witnesses was an effort to show that David Runyon was a genuine, caring, gentle, helpful, good with children, that sort of individual. The last witness they called was a pastor who described David Runyon as quiet, gentle, fun, and generous. They were trying to, as the government had in terms of presenting victim impact evidence, also show that David Runyon had friendships and relationships and family that would be impacted by a sentence. And they were also trying to focus on the equally culpable factor and whether or not this was fair. And, Your Honor, this was a case where David Runyon had contested his guilt. He had gone to trial. The jury had rejected that defense and they found him eligible for the death penalty. And so the focus of the defense, as Attorney Woodward said, the best... But, Counsel, Mr. Samuels, Mr. Samuels, it's your point here. They didn't have a chance to reject the clear mental findings of those two doctors. That's the problem with this case. I'd agree with you if they had gotten on there and said, well, the weight of the evidence, they should have reviewed them. The jury didn't have a chance to reject it. Period. He didn't put any. It wasn't a matter of a quantum. For example, if he had put one on and not the other, we could say, well, they put both. If he had put... He put zero on. Zero. And on the record, it's clear it was not a strategy. His own words. He doesn't even remember. Well, Your Honor, and that's why... The Supreme Court has said so often that death is different. It's a heightened standard on the Eighth Amendment when you're talking about killing someone and you don't give a chance. And he talked about what you said. You said he put on a mitigation. I don't mean to be disrespectful about this, but a lot of people have people in their families who will get on the stand and say, don't kill him. Like mom, brother, son, children, all those things like that. But it's a difference when you have an expert saying, there's something wrong with this man. There's something... Brain damage, all those kind of things that you don't follow up and you don't put any on. And you're saying that this... And Judge Wilkinson writing for the majority in this case before in the analysis, he's right. When we looked at it, he said that jurors have a broad range of assessing the evidence. But not... You don't build any. Certainly that's true, Your Honor. But in a 2255 context and the habeas context, the court also has to consider is there a reasonable probability that this would have changed the sentence when compared with all of the evidence of aggregation. And I guess my point is that this mental health evidence cut against some of the findings that the jury had already made and was inconsistent with some of the other mitigation evidence that the defendant chose to proceed with. Let me ask you in that regard. Yes, Your Honor. Dr. Marikangas suggested that this brain injury rendered the defendant delusional. If he killed while in a state of grandioseness and delusion, it would be an explanation that a jury might consider as mitigating, not that he didn't do it and not that he's not responsible, but rather an explanation that a brain injury contributed to an explanation for what he was doing. I don't know if that's what would have come out, but that was the information that was provided to the attorney that the attorney could demonstrate that the defendant was delusional at the time. How does the evidence the jury had contradict that? Well, Your Honor, the evidence that the jury had was this jury had sat through a guilt phase and heard dozens of witnesses and hundreds of exhibits, and that allowed them to make findings in aggravation before the mitigation phase ever started. And one of those findings was that the defendant intentionally killed Corey Voss. Another was that he executed and engaged in substantial planning and preparation to do so. And this was not a case where there are cases out there, of course, where mental health information would tend to explain away the crime. This was a crime done for greed. It was planned carefully. It was done deliberately. David Runyon buying the gun the day of the murder, arranging with Michael Draven to do it, driving 600 miles from West Virginia, lying in wait for Corey Voss at an ATM machine in Newport News, trying to make this look like a bank robbery or a carjacking to dissuade law enforcement from knowing that this was really a complex murder-for-hire plot, and then extensive scheming afterwards to cover the trails. Don't you think a person who was delusional could have done all that? This man is a very smart man. And if he was a smart man and he was delusional, he could have done everything you just suggested. But yet the delusion might suggest an argument for mitigation. I mean, none of this is for certain. I think the question is, we're lacking an explanation of why the jury wasn't allowed to have this information and consider it. And your argument basically is trying to say, well, it wasn't prejudicial and I'm not convinced about whether it's prejudicial or not because the issue isn't whether he did it or the issue isn't whether he planned it. The issue is whether his doing it and his planning was part of a delusional conduct. And if the jury thought so, then the question is, would they have weighed the mitigating and aggravating factors differently? We can't say, of course, but I think that's the argument that Runyon's making here today. Yes, I understand, Your Honor. And on that point, I would also say that in looking at what counsel had, and I think this goes into both the effectiveness issue and into the prejudice issue, these reports, you would have to take them as a whole, both the reports of his experts and then also the government reports that would then come in on rebuttal. No, we don't have any law that says they have to withhold investigating because the government said so. Strickland requires the defendant's lawyer to represent the defendant not to accommodate the government's experts. No, Your Honor, and I'm not suggesting that, but I'm talking about in terms of the reasonableness of counsel's approach and what information counsel had available to them at the time they decided to put on their mitigation case. And again, the government's view is that the strategy that the counsel employed was focused on this equally culpable. Counsel Woodward said that. I think the strategic decision is an excellent argument, but I didn't see any evidence for a strategic decision being made. As a matter of fact, everything we hear from Hudgens is that had he known this information or appreciated it, he would have followed up on it, and he has no explanation why he did it. He does not say he made a strategic decision. Moreover, he pressed for this information rather than abandoning it. He pressed the court, and he indicated he was working hard to gather this information rather than abandoning it in favor of a different course. All of those would have been indicative of a strategic decision, but do you have any evidence to point to that I can go look at that indicates that Hudgens did not put on or pursue the information from Merikangas and the other doctor because he had a strategic decision to go a different direction? Your Honor, the evidence that we have of that, apart from Mr. Hudgens' declaration where he did not remember the results of the test, is that both the reports of Dr. Murski and Dr. Merikangas were preliminary in nature, and we know that the scans were done, that Mr. Hudgens sought permission to give those scans to the experts, and at least by the letter of Dr. Murski, that those two scans were clear based on the report. That's the information that we have, and you put that information together with the unfavorable report of Dr. Nelson, which Hudgens acknowledges, which Woodward acknowledges, and the reports of the two government experts which go against any kind of cognitive impairment, and even all of the defense experts agree that Runyon is intelligent. He did well in the cognitive test. In some tests that he administered in 2015, he did better in 2015 than he'd done back in 2009, and when you put that together, coupled with the focus that defense counsel did take, which seemed contrary to anything that would have looked for an explanation for why Runyon did it, but an explanation, or not an explanation, but a request for fairness, a request for mercy, and that was the approach that his counsel took, saying that it wasn't fair to give David Runyon a death penalty because Katarina Voss and Michael Draven weren't going to be able to work with it. Wouldn't it have been even more forceful in connection with that argument, which I agree with you is a good argument to make, but wouldn't it have been even more powerful if he were able to say that that differential is not appropriate here because while Runyon is a very smart man and very capable of thinking and reasoning, he was delusional at the time he committed it? Mr. Samuels? Yes, Your Honor. I think I understand what you're going at, and I think you're going at this both through the competency prong of Strickland and through the prejudice prong because it seems to me your arguments speak to both prongs, and the district judge here seems to me to have a good handle on this. As to the strategic prong, maybe he didn't state in so many words, I am making a strategic decision here, but the circumstances certainly suggest that had a strategic decision, because had he put on evidence of mental health problems which went to anger management and to impulsiveness, it would have undermined his entire case. It would have undermined the portrait he was trying to paint of this individual as being somebody who was gentle and specific going forward, and to say that he didn't make a strategic decision here when to have pursued the road that they now say, that counsel now says on collateral attack, we're not supposed to second guess this kind of thing under Strickland. This evidence, had it been put on, would have exploded the entire case that counsel was trying to make and the portrait that he was trying to paint. And the question then, that's the strategic prong of it. Then you get to the prejudice prong of it, and there's a key link missing in my judgment, because it's not clear to me that even if he is delusional or he has some kind of mental health issue, there's still not a sufficient link with the causation of the crime. When you read the evidence of how thoroughly this crime was planned out, how there was bargaining over the financial arrangements and funds, extensive planning, that doesn't seem to me to link up causationally. If he may have had mental health issues, I don't know, but I don't see how it bears upon the deliberateness and care with which this murder for hire was carried out. He wanted money. There's nothing delusional about that. It's rational in a very perverse sort of way. And so I don't understand this, either from a strategic point of view or a prejudice point of view. And what we're talking about here is the results of a proceeding where the jury had a great deal of evidence, not only about who committed the crime, but with the kind of planning and foresight and deliveredness and cold calculating rationality with which it was committed. So I don't have any particular brief for capital crimes. I think if I were in a legislature, I'd vote against capital punishment. But I think just as a matter of law, of Strickland, and not using collateral attack to undermine these kinds of proceedings into which so much effort has been put. And I don't see it either from a strategic point of view or a prejudice point of view that the claim has been put forward. And of course, it's the petitioner who bears the burden. Yes, Your Honor, thank you. And I think the court also needs to consider that in looking at the competence of counsel and the strategy that counsel employed, we're looking at the constraints that counsel was under. We're looking at the time limitations. This is not an open-ended situation where counsel has all the time and the resources in the world. And looking at that, the way the deck was put together there for counsel and the efforts that he was undertaking, and then looking at what was actually done there, the focus was on showing that David Rynan was not the worst of the worst, a mental health picture that would have shown that he was. And the diagnoses are all over the board, Your Honors, in terms of the government's experts of personality disorder, defense experts, surgeons. But counsel, that's why you have the jury to decide. They didn't go to law school like we did. With all due respect to all of our wonderful comments, they're all correct, and they're very exact, and they're jurisprudential. But they are citizens who come there who try to understand the nuances of the human experience. And when you have an expert saying things like brain damage and delusional, don't forget, when it comes to this on the punishment phase, it doesn't have to be evidence. As Judge Wilkinson said in the majority opinion, it only has to be information. Even if you put the information there for them to decide. And the point, too, because it's very important about the majority opinion, because if you're reading, I think Judge Wilkinson did a good job. But it shows you exactly why this has to go back, in a sense, because the whole idea, we found that that 42-minute video, for example. And I know Judge Mead and I had a different view as to the race, but I'm not talking about that part. I'm talking about the part, and we said it was harmless because there was evidence that showed remorse beyond that. And it did about the boasting and those things. And then at the other part of the probability, we know it's not harmless. It was harmless because he got a unanimous vote on that as a mitigator. But you can't put aside this part. What counsel was dealing with, the police officer was able to get on the stand in that video, not on the stand, but in the video, and said, you, if I leave this room and you don't help me, you must be a monster. And the jury's going to find that you're a cold-blooded monster, and you're a piece of shit. That was already in this case. He had to have something. For example, he had his mental problems dealt with the idea that he was silent in there because the whole idea was to show he was silent for 42 minutes. So he was just, hmm. They could have said, well, I see why now. He's mentally ill. He has mental problems. He's not just cold-blooded. He's delusional. And to say that in a death case, you don't get, they don't get one scintilla of that, that we can be satisfied that that's adequate for a man to go to the gallows, or a woman, but he's a man. And he said there's no other strategy. I don't even know why I did it. And every indication, like Judge Nehemiah said, is that he was trying to pursue it. And there's no explanation. And as counsel, I'd be standing on the table saying I need a little continuity on it because I need one more day. I need to go get these records. I need this. I need to follow up. And at the very end, if you don't, give them the information. It doesn't require to be admissible under evidence. It's just what the writer said. It's information. And they decide. Your Honor, I certainly understand that. And from the record, it was clear that Attorney Hudgens was pursuing this and he was pursuing it diligently. And then the scans came in. The information that we have in the scans from the radiologist, which was passed on at some point, was that it didn't show information. And so at that point, with the penalty phase coming up there, defense counsel made clear from the array of witnesses and the strategy they took on that,  something that defense counsel had asked the jury to find a non-guilty in the guilt phase, but to try and ask for mercy, to try and look for fairness. And the focus was on those aspects and pointing out the positive aspects of David Runyon, not aspects which would have allowed the jury to think that he could be a future danger or he had some sort of personality disorder or there were the effects of experimental drugs. And there were all these shifting views that were presented in these expert reports. Defense counsel, from what they presented, was looking for a consistent theme to present to this jury. And that's why they presented the mother and all of that family information, all the information showing good things about David Runyon in the past to show that he... Mr. Samuels, Mr. Samuels, when you look at this record as a whole, you will understand that this defense attorney gave Mr. Runyon a very good defense. It was vigorous. All kinds of claims were raised. There was a consistent strategy pursued throughout. And you can always come on... You know, there's always some evidence that is developed post-trial or that you can all... If not, you can always say, would have, could have, should have. And, you know, it's trite, but it's still true that hindsight is always 20-20. But to say that this man was ineffective... I've read this record and looked at the kind of arguments that he made, and it was vigorous from start to finish. And his problem was not a mental health problem or delusional. His problem was with the nature of the case, which was a deliberate, cold-blooded murder of another individual for money. And the jury saw that, and I can't believe anything would have dislodged it. In fact, had this other evidence been brought up, it would probably have been blown out of the water by the prosecution, and I doubt it would have dislodged the jury from its ultimate verdict here. This was a good lawyer. Mr. Samuels? Yes, Your Honor. Our timekeeper, what time do we have? I haven't heard of a bell. Yes, I was just getting ready to ring that. Mr. Samuels, his time is up. I was about to say that, because my own mental clock, I could tell it was up. But anyway, I was going to ask you a question, but your time is up. That's fine. Okay. Thank you, counsel. Thank you, Your Honor. Ms. Bales? I would like to rebut some of the state's assertions. First, the government's assertions. The government seems to think that the mitigation is an either-or, that if you put on evidence that someone is a good citizen, that you're not allowed to put on evidence that they're also mentally ill or that they have brain damage. Those two strategies are not inconsistent. And so, you know, the counsel could have put that evidence on about mental illness and brain damage, and it would not have undermined that Mr. Runyon is a good citizen. The evidence would have supported or added weight to trial counsel's evidence on equal culpability. You know, not only did everyone participate in this crime together, but Mr. Runyon is mentally ill and has brain damage, and so he's actually, that lessens his culpability. Another point I would like to make for the court is the jury found that Mr. Runyon was led to believe that Mr. Voss was harming his children. And this was not argued to the jury. It was not presented as a non-statutory mitigating circumstance. The jury on its own picked up on this evidence, and they found that it was mitigating. If they had had the mental health evidence of Mr. Runyon's delusional disorder, it would have given that mitigating circumstance additional weight. It would have allowed the jury to place more weight on that factor. I was wondering about that. That never came into evidence, did it? So mitigating the evidence that Mr. Runyon was led to believe this? Yes, yes. Your Honor, it must have come into evidence somehow because the jury, you know, that is handwritten on the verdict form. But have you found it, though? Have you found it, the evidence? Your Honor, I can't. Your Honor, give me a second. I believe I can. No, no, no. I'm not trying to ask you to hunt for the record. I have a big record. I'm asking, have you seen it? It's not a trick question. I'm just asking. It's not there, is it? Your Honor, Ms. Voss gave a statement, and it's actually attached to the trial court's order. And she talks about that she had indicated to Mr. Runyon that this was going on. And this was also – this evidence also comes out of the phone calls that the government had recorded. Okay. So it came through. The government put that in? Yes, Your Honor. Okay. The other point I would like to make, I encourage this court to look at trial attorney Hudgins' declarations because he explains that a radiologist reading a report as regular or normal is not the same as giving that report to the expert. He's asked about this, and he explains that. He also explained that he would anticipate that the government would offer mental health evidence, but that would not be a reason for him not to present his own mental health evidence. And the government's reports are not – they were not strong in presenting some kind of damaging, harmful portrait of Mr. Runyon. But in fact, Dr. Maltabano noted Mr. Runyon's head injury when he was 3 years old and some of the symptoms that he was describing and said that a neuropsychological exam would rule in or rule out brain damage. So, you know, the government's reports were not really something to run from. Another point I would like to make is that the government was talking about all of the efforts that the trial attorney made, but the test is what the trial attorney did not do. And he did not even give the MRI to Dr. Marikanga. He knew that this test had been performed. He didn't even give it to his mental health expert to let him review it. He didn't uncover the Army records. He didn't interview all of the different lay witnesses who described the change in Mr. Runyon's behavior from before to after the 1996 CAR Act. He stopped his investigation into the mental health and effectively was unable to present that evidence. Another point I would like to make is the government noted that the trial attorney was concerned the evidence would blow up or would sort of be construed as bad, harmful to Mr. Runyon, but the jury found the aggravating circumstances that the government offered. So that negative evidence was already in the record, but the unpresented mental health evidence would have mitigated or caused those aggravators to have less weight. And finally, Your Honor, several of the points the government makes are credibility findings based on the evidence that the district court had. And again, I would iterate if the court has concerns about that evidence, the appropriate remedy is to remand for an evidentiary hearing on the sentencing claim. And unless the court has any other questions. Thank you, counsel. Excuse me, I didn't hear you. Are you finished, you said? Yes, Your Honor, I am. Okay, I just want to say, Ms. Bell and Mr. Samuel, thank you for your arguments. We regret that we can't come down like we would and shake your hands and please know that that is our sentiment and our appreciation for your argument here today. And thank you very much. And with that, I think I'll ask the clerk to give us a brief recess. The court will take a brief break before hearing the next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Paul V. Niemeyer